## In re BRIDGESTONE/FIRESTONE, INC., TIRES PRODUCTS LIABILITY LITIGATION.

This Document Relates To:

Columbian Cases: IP 00–5083–C–B/S; IP 00–5089–C–B/S; IP 00–5090–C B/S; IP 00–5098–C B/S; IP 00–5099–C B/S.

Venezuelan Cases: IP 00–5011–C–B/S; IP 00–5013–C–B/S; IP 00–5078–C–B/S; IP 00–5079–C–B/S; IP 00–5080–C–B/S; IP 00–5081–C–B/S; IP 00–5082–C–B/S; IP 00–5084–C–B/S; IP 00–5085–C–B/S; IP 00–5086–C–B/S; IP 00–5088–C–B/S; IP 00–5092–C–B/S; IP 00–5093–C–B/S; IP 00–5094–C–B/S; IP 00–5095–C–B/S; IP 00–5096–C–B/S; IP 00–5097–C–B/S; IP 00–5100–C–B/S; IP 00–5101–C–B/S; IP 00–5102–C–B/S; IP 00–5103–C–B/S; IP 00–5104–C–B/S; IP 00–5105–C–B/S; IP 00–5106–C–B/S; IP 00–5107–C–B/S; IP 00–5108–C–B/S; IP 00–5109–C–B/S; IP 00–5110–C–B/S; IP 00–5111–C–B/S; IP 00–5112–C–B/S; IP 00–5113–C–B/S; IP 00–5114–C–B/S; IP 00–5115–C–B/S; IP 00–5116–C–B/S; IP 00–5117–C–B/S; IP 00–5118–C–B/S; IP 00–5119–C–B/S; IP 00–5120–C–B/S; IP 01–5177–C–B/S; IP 01–5178–C–B/S; IP 01–5180–C–B/S; IP 01–5181–C–B/S; IP 01–5182–C–B/S; IP 01–5183–C–B/S; IP 01–5184–C–B/S; IP 01–5185–C–B/S; IP 01–5186–C–B/S; IP 01–5187–C–B/S; IP 01–5188–C–B/S; IP 01–5189–C–B/S; IP 01–5190–C–B/S; IP 01–5191–C–B/S; IP 01–5193–C–B/S; IP 01–5219–C–B/S; IP 01–5220–C–B/S; IP 01–5221–C–B/S; IP 01–5222–C–B/S; IP 01–5223–C–B/S; IP 01–5224–C–B/S; IP 01–5225–C–B/S; IP 01–5231–C–B/S; IP 01–5232–C–B/S; IP 01–5266–C–B/S; IP 01–5267–C–B/S; IP 01–5268–C–B/S; IP 01–5273–C–B/S; IP 01–5287–C–B/S; IP 01–5288–C–B/S; IP 01–5312–C–B/S; IP 01–5313–C–B/S; IP 01–5314–C–B/S; IP 01–5315–C–B/S; IP 01–5321–C–B/S; IP 01–5322–C–B/S; IP 01–5325–C–B/S; IP 01–5326–C–B/S; IP 01–5327–C–B/S; IP 01–5331–C–B/S; IP 01–5333–C–B/S; IP 01–5334–C–B/S; IP 01–5335–C–B/S; IP 01–5340–C–B/S; IP 01–5342–C–B/S; IP 01–5343–C–B/S; IP 01–5344–C–B/S; IP 01–5345–C–B/S; IP 01–5346–C–B/S; IP 01–5347–C–B/S; IP 01–5348–C–B/S; IP 01–5349–C–B/S; IP 01–5350–C–B/S; IP 01–5370–C–B/S; IP 01–5371–C–B/S; IP 01–5385–C–B/S; IP 01–5385–C–B/S; IP 01–5387–C–B/S; IP 01–5388–C–B/S; IP 01–5389–C–B/S; IP 01–5395–C–B/S; IP 01–5396–C–B/S; IP 01–5396–C–B/S; IP 01–5398–C–B/S; IP 01–5413–C–B/S; IP 01–5414–C–B/S; IP 01–5427–C–B/S; IP 01–5428–C–B/S; IP 01–5429–C–B/S; IP 01–5430–C–B/S; IP 01–5431–C–B/S; IP 01–5432–C–B/S; IP 01–5434–C–B/S; IP 01–5462–C–B/S; IP 01–5463–C–B/S; IP 01–5464–C–B/S; IP 01–5465–C–B/S; IP 01–5466–C–B/S.

Master File No. IP 00–9373–C–B/S MDL No. 1373.

United States District Court, S.D. Indiana, Indianapolis Division.

March 25, 2002.

Don Barrett, Barrett Law Office Pa, Lexington, MS, Victor Manuel Diaz Jr, Podhurst Orseck Josefsberg & Eaton, Miami, FL, Mike Eidson, Colson Hicks Eidson, Coral Gables, FL, Irwin B Levin, Cohen & Malad, William E Winingham, Wilson, Kehoe & Winingham, Indianapolis, IN, for Plaintiffs.

John H Beisner, O'Melveny & Myers LLP, Washington, DC, Daniel P Byron, Bingham McHale, LLP, Indianapolis, IN, Mark Herrmann, Jones Day Reavis & Pogue, Thomas S Kilbane, Squire, Sanders & Dempsey LLP, Cleveland, OH, Mark Merkle, Krieg Devault LLP, Randall Riggs, Locke Reynolds LLP, Indianapolis, IN,

Colin P Smith, Holland & Knight LLP, Chicago, IL, Thomas G Stayton, Baker & Daniels, Indianapolis, IN, for Defendants.

## ORDER DENYING DEFENDANT FORD AND FIRESTONE'S MOTIONS TO DISMISS COLOMBIAN AND VENEZUELAN CASES ON GROUND OF FORUM NON CONVENIENS

BARKER, District Judge.

Defendants Ford Motor Co. ("Ford") and Bridgestone/Firestone, Inc.[1] (Firestone) filed various motions and supplemental motions to dismiss certain personal injury and wrongful death cases on the ground of forum non conveniens. For the reasons set forth below, these motions are *DENIED* with respect to the cases listed in the caption above.

### Procedural Background

Approximately 700 personal injury and wrongful death cases have been filed against Ford and/or Firestone in federal courts around the country alleging that defects in Ford Explorers and certain models of Firestone tires were responsible for the accidents causing the injuries suffered by Plaintiffs. The cases were transferred to this court by the Judicial Panel on Multidistrict Litigation, pursuant to 28 U.S.C. § 1407 on October 26, 2000. Approximately 200 of these cases were filed by Plaintiffs who were injured in accidents that occurred in foreign countries, including Colombia, Venezuela, Thailand, Panama, and Ecuador. On December 21, 2000, the first of many motions to dismiss these cases on the ground of forum non conveniens was filed by Ford. Ford asked that, for the cases involving accidents in Venezuela, the cases be dismissed from this litigation in lieu of further proceedings in Venezuelan courts. A corresponding motion sought dismissal of the cases involving accidents occurring in Colombia in favor of trial in Colombian courts. Firestone soon followed Ford's lead in seeking such relief. In February 2001, we granted Plaintiffs' motion to conduct discovery on forum non conveniens issues. *In re Bridgestone/Firestone, Inc. ATX, ATX II and Wilderness Tires Products Liability Litigation,* 131 F.Supp.2d 1027 (S.D.Ind.2001). Because of the complexities of this doctrine and because the majority of the foreign cases originate from Colombia and Venezuela, the parties briefed, and we rule on here, only the cases listed in the caption above, all of which are Colombian or Venezuelan cases. Of course, our ruling carries implications for the remainder of the forum non conveniens motions which the parties should take into account when determining their strategies in the remaining cases.

### Forum Non Conveniens Analysis

"[T]he central focus of the forum non conveniens inquiry is convenience." *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 249, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). In other words, "a trial court may dismiss a suit over which it would normally have jurisdiction if it best serves the convenience of the parties and the ends of justice." *Kamel v. Hill–Rom Co., Inc.,* 108 F.3d 799, 802 (7th Cir.1997) (citations omitted). The forum non conveniens inquiry is guided by a number of considerations. First, an adequate alternative forum must be available to hear the case. *Id.* If this threshold criterion is satisfied, then the court must identify various private and public interest factors and balance them to determine if their weight favors dismissal. *Id.* at 803; *see also ISI International, Inc. v. Borden Ladner Gervais, LLP,* 2001 WL 1382572, at *2 (N.D.Ill. Nov.5, 2001) ("the court must balance the private interests of the litigants and the public interests of the

---

**1.** Bridgestone/Firestone North American Tire, LLC is Firestone's new legal name.

forum to determine the superior forum"). Ford and Firestone "bear[ ] the burden of persuasion as to all elements of the forum non conveniens analysis." *Lacey v. Cessna Aircraft Co.*, 862 F.2d 38, 43–44 (3d Cir.1988) (*Lacey I* ); *see also Pyrenee, Ltd. v. Wocom Commodities, Ltd.*, 984 F.Supp. 1148, 1161 (N.D.Ill.1997) ("The defendant has the burden of demonstrating forum non conveniens.").

**Adequate Alternative Forum**

■ We first determine whether there is an adequate alternative forum in which to hear these cases. *Piper*, 454 U.S. at 254 n. 22, 102 S.Ct. 252. Whether there is an adequate alternative forum for Plaintiffs' claims is a "two-part inquiry: availability and adequacy." *Kamel*, 108 F.3d at 802. A forum is "available" if "all parties are amenable to process and are within the forum's jurisdiction." *Id.* at 803 (citing *Piper*, 454 U.S. at 254 n. 22, 102 S.Ct. 252). An alternative forum is "adequate" when "the parties will not be deprived of all remedies or treated unfairly." *Id.* (citing *Piper*, 454 U.S. at 255, 102 S.Ct. 252).

**Venezuelan Courts**

■ We begin by addressing whether the courts of Venezuela provide Plaintiffs allegedly injured in Venezuela an adequate alternative forum in which to bring their claims. Defendants have submitted the affidavits of two experts (Rengel and Cottín) who testify that "citizens and residents of Venezuela may bring suit in the Venezuelan courts to assert claims against nonresident defendants such as Ford and Firestone for conduct related in part to events occurring in Venezuela." Rengel Aff. ¶ 9; *see also* Cottín Dec. ¶ 13 ("the Venezuelan courts ... have jurisdiction to address a complaint against persons who are not domiciled [or present] in Venezuela ..."). Plaintiffs contest this assertion with the affidavits of their own experts. Tatiana B. deMaekelt, head of the private

international law department at Universidad Central de Venezuela and Universidad Católica Andrés Bello, reaches the opposite conclusion regarding the jurisdiction of Venezuelan courts in these cases. As explained below, the testimony of Rengel and Cottín does not satisfy Defendants' burden of establishing Venezuela as an available alternative forum.

Plaintiffs' expert, deMaekelt, explains that Article 39 of the Statute of Private International Law "provides that the first forum for bringing suit against a non-domiciliary defendant is the country where the defendant is domiciled." DeMaekelt Aff. ¶ 3. DeMaekelt, in partial agreement with Defendants' experts, then identifies two potentially applicable exceptions to this principle, which are set forth in Article 40 of the Statute on Private International Law. *Id.* at ¶ 6; *see also* Rengel Aff. ¶ 12. The first of these exceptions permits jurisdiction over personal injury cases with non-domiciliary defendants "where the facts are verified" in Venezuela and where a contract is executed in Venezuela. Article 40(2) (cited in Cottín Reply Aff. ¶ 6; deMaekelt Aff. ¶¶ 6, 12). According to Ford and Firestone, because the vehicles involved in the accidents at issue were purchased or leased in Venezuela, and because the accidents occurred in Venezuela, Venezuelan courts have jurisdiction over these cases as the site "where the facts were verified." Cottín Reply Aff. ¶ 7–9. DeMaekelt calls Cottín's conclusions into serious doubt. She opines that the language of Article 40(2) is not as clear as Defendants suggest and states that this subparagraph requires the equivalent of a "most significant contact" analysis, likely resulting in the determination that Venezuelan courts would not have jurisdiction over the cases on this basis. DeMaekelt Aff. ¶ 13. DeMaekelt adds that she is not aware of any reported cases in which a Venezuelan court accepted jurisdiction on

the basis of the quoted language in Article 40(2). Cottín responds by pointing out that deMaekelt's proposed most significant contact analysis is not codified in any Venezuelan law [2] and that, because Venezuela has a civil law system, rather than a common law system, the lack of reported case decisions is irrelevant. Cottín Reply Aff. ¶¶ 8–9. In short, Cottín's position is that the "literal meaning" of Article 40(2) establishes the Venezuelan court's jurisdiction over the cases at issue here. *Id.* at ¶ 7.

In his original declaration, Cottín relied on Article 53 of Venezuela's Code of Civil Procedure for the proposition that executing a contract or "verification" of facts in Venezuela permits jurisdiction over Ford and Firestone. Cottín Dec. ¶ 13. It turns out, as all parties agree, that Article 53 was abrogated by the Statute on Private International Law. DeMaekelt Aff. ¶¶ 18–20; Cottín Reply Aff. ¶ 6 n. 1; Rengel Dep. at 113. While it is true that Article 53 of the Code of Civil Procedure and Article 40(2) of the Statute on Private International Law say much the same thing, we are understandably reluctant to put much stock in Cottín's interpretation of the language of the latter law. *See Pyrenee,* 984 F.Supp. at 1164 (discounting plaintiff's expert testimony partly on basis that expert relied on earlier draft of law at issue). Our reluctance is heightened by

the fact that Cottín, at his deposition, admitted that he had not reviewed the Statute on Private International Law prior to submitting his opinion on jurisdiction in the case. Cottín Dep. at 93. In short, Cottín formed his initial opinion in this case without considering the statute on which he now offers his "expert" opinion for our reliance. Hence, we find deMaekelt's opinion that Article 40(2) does not confer jurisdiction over Defendants to be more reliable than Cottín's opinion to the contrary.[3] We thus adopt the view that based on Article 40(2) Venezuelan courts are not an available forum on the basis of the presence in Venezuela of relevant contracts or "verified facts."

Ford and Firestone cite a second exception to Article 39 of the Statute of Private International Law in support of their contention that Venezuelan courts have jurisdiction over these cases. Article 40(4) of the Statute on Private International Law permits jurisdiction over a non-domiciliary when the parties submit to the jurisdiction of Venezuelan courts. Article 40(4) (cited in deMaekelt Aff. ¶¶ 8–11; Cottín Reply Aff. ¶ 6; *see also* Rengel Dec. ¶ 12). Cottín and Rengel conclude that Venezuelan courts would recognize the consent of Ford and Firestone to jurisdiction over these cases in Venezuela. Cottín Dec. ¶ 13;

**2.** Cottín points out that deMaekelt cites an article deMaekelt herself authored to support her contention that a most significant contact analysis is required by Article 40(2) of the Statute of Private International Law. Cottín Reply Aff. ¶ 9 n. 2 (citing deMaekelt Aff. ¶ 13 n. 5). While we understand that Defendants' note of this fact is intended to suggest that deMaekelt's opinion is of limited value because she relies only on her own published work, we reject Defendants' implication. Instead, if anything, as compared to Cottín, deMaekelt's cite to her prior publications increases our willingness to rely on her expertise on the subjects of private international law in Venezuela and the jurisdiction of Venezuelan courts. As Cottín admitted at his de-

position, he has not published any articles on the jurisdiction of Venezuelan courts over products liability cases, the civil jurisdiction of Venezuelan courts, or private international law in Venezuela. Cottín Dep. at 87–89. In fact, Cottín admitted that private international law "is not [his] specialty." *Id.* at 91.

**3.** As discussed below, because Defendants bear the burden of persuasion that Venezuela is an adequate alternative forum, our finding that deMaekelt's testimony is more reliable than Cottín's opinion substantiates our conclusion that Defendants fall far short of the standard required to show that Article 40(2) confers jurisdiction over Ford and Firestone.

Rengel Dec. ¶ 12. DeMaekelt attacks these conclusions, maintaining, on the basis of Article 40(4) and Article 44 of the Statute on Private International Law, that *express* submission by *both* parties is required in order for Venezuelan courts to have jurisdiction over the actions at issue here. DeMaekelt Aff. ¶¶ 9–10. On this basis, Plaintiffs argue that, by bringing their cases in the United States, they are not expressly submitting to the jurisdiction of Venezuelan courts, and that the unilateral submission of Ford and Firestone to Venezuelan jurisdiction is insufficient to create jurisdiction. DeMaekelt Aff. ¶ 9–11; Plaintiffs' Memo. at 18. Defendants argue:

> Of course, no one can *force* plaintiffs to refile these actions in Venezuela after they are dismissed in the United States. If plaintiffs willfully elect not to pursue their claims in Venezuela, that is their choice.... But the critical point is that *if* these actions are dismissed, plaintiffs *can* file their claims in Venezuela. And if they do, defendants have agreed not to challenge the Venezuelan court's jurisdiction, thus satisfying Article 40 (subparagraph 3).

Joint Reply at 17 (emphasis in original). We acknowledge the appeal of Defendants' argument. However, two key points prevent the argument from pulling the weight Defendants place on it.

First, Defendants' argument dismisses the express language of Article 40 that requires the acquiescence of both "parties" to the jurisdiction of the court. Defendants address Article 40 as if it sets out limitations akin to personal jurisdiction over non-domiciliary defendants—limitations that they can unilaterally waive. We find, however, consistent with deMaekelt's analysis, that Article 40 is more reasonably read to set forth the Venezuelan courts' jurisdiction over *cases* involving non-domiciliary defendants—and it provides for jurisdiction over cases when *both* parties submit to jurisdiction.

Second, unreliable experts cannot carry Defendants' burden of persuasion. That Defendants experts are unreliable cannot be denied. As noted above, in addition to admitting that he is not a specialist in the subjects disputed here, Cottín first formed his opinion in this case on the basis of an abrogated statute.[4] We are even less inclined to rely on the opinion of Defendants' other expert, Rengel. Rengel's opinion that Venezuelan courts have jurisdiction over Ford and Firestone is merely conclusory. Rengel Aff. ¶¶ 11–12. He does not address deMaekelt's interpretation that Plaintiffs have not consented to jurisdiction in Venezuela, thereby rendering ineffective Ford and Firestone's consent. Most significantly, Rengel, a partner in the law firm of Travieso Evans Arria Rengel & Paz, personally handles litigation for Ford in Venezuela. Rengel Dep. at 70–71.[5] That Defendants bear the burden of

---

4. In sharp contrast to Cottín's lack of familiarity with the Statue on Private International Law, deMaekelt has much experience on which to base her knowledge of the law. DeMaekelt served as president of the commission charged with drafting the final version of the statute prior to its presentation to the Venezuelan National Assembly. DeMaekelt Aff. ¶ 2. She also has published extensively on the Venezuelan Statute on Private International Law. *Id.* Such credentials understandably contribute to our willingness to rely on deMaekelt's statements regarding the statute.

5. It is possible that Rengel is involved in the very cases for which he offers his expert opinion. When asked whether he "had any involvement with respect to the investigations or claims arising out of Ford Explorer accidents in Venezuela," Rengel's attorney instructed Rengel not to answer. Rengel Dep. 76–82. His failure to answer a question so fundamental to this court's assessment of his credibility as an independent, objective expert renders Rengel's opinion virtually useless.

persuasion with regard to the adequacy and availability of an alternative forum also is clear. *Mercier v. Sheraton International, Inc.,* 935 F.2d 419, 425 (1st Cir. 1991); *El–Fadl v. Central Bank of Jordan,* 75 F.3d 668, 677–79 (D.C.Cir.1996) (overturning grant of forum non conveniens dismissal on ground that district court failed to hold defendants to their burden of persuasion on question of whether Jordan was adequate alternative forum); *Cleary v. Sterenbuch,* 2001 WL 1035285, at *3 (N.D.Ill. Sept.10, 2001) (denying forum non conveniens motion because, among other reasons, defendant "fail[ed] to establish that Liechtenstein is an adequate forum").

The unreliability of their experts, in light of the burden Ford and Firestone bear, is fatal to their contention that Venezuelan courts could exercise jurisdiction over these cases. Here, Plaintiffs' expert offers a reasonable interpretation of the key provision regarding consent to jurisdiction which Defendants fail to address with credible expert testimony. Instead, they offer conclusory opinions of discredited experts. Enough of a question is raised by deMaekelt's opinion that Defendants, with their unreliable expert testimony, fail to meet their burden of persuasion

that Venezuelan courts are an available alternative forum.[6] *El–Fadl,* 75 F.3d at 679 (defendants did not meet burden of persuasion when their expert failed to address various potentially dispositive provisions of foreign law called to court's attention by plaintiff's expert); *Mercier,* 935 F.2d at 425 (finding that gaps in defendant's expert affidavit prevented defendant from carrying its burden even in light of plaintiff's failure to provide competing evidence on significant issue).

While our finding that Venezuelan courts are not an available alternative forum is a sufficient basis for denying Defendants' motion, we also address the adequacy of Venezuela as an alternative forum. *See Leon v. Millon Air, Inc.,* 251 F.3d 1305, 1311 (11th Cir.2001) ("Availability and adequacy warrant separate consideration."). The standard by which we judge whether Defendants have met their burden of persuasion on adequacy is not demanding. In *Kamel,* the Seventh Circuit opined that "[a]n alternative forum is adequate when the parties will not be deprived of all remedies or treated unfairly." 108 F.3d at 803. The absence of strict liability does not render a foreign

---

**6.** We are also unpersuaded by Firestone's citation to cases finding that Venezuela is an adequate alternative forum. Firestone's Memo. at 6 n. 8. Given the highly fact specific nature of the forum non conveniens inquiry, the courts in the cases cited by Firestone could no more conclude that Venezuela is an adequate forum for all time in all cases than we could find that Venezuela is *not* an adequate alternative forum for all time in all cases. In *Bhatnagar v. Surrendra Overseas, Ltd.,* the Third Circuit upheld the district court's conclusion that India was not an adequate alternative forum on the ground that the essence of the district court's decision was that the defendant "had not met its burden of proof on that threshold issue." 52 F.3d 1220, 1230 (3d Cir.1995). We share the Third Circuit's sentiment that "[i]t may well be that the next defendant to face the same issue ...

would reach a different result because it would marshal more—or better—proof." *See also McLellan v. American Eurocopter, Inc.,* 26 F.Supp.2d 947, 950 (S.D.Tex.1998) ("While it is not irrelevant that some federal courts have found Canada to be an adequate, alternative forum, it is also not controlling given the fact specific nature of a forum non conveniens inquiry.").

In addition, we also note that some of the cases cited by Firestone involved readily distinguishable facts and procedural postures. *E.g., Blanco v. Banco Industrial de Venezuela, S.A.,* 997 F.2d 974 (2d Cir.1993) (defendant not only domiciled in Venezuela, but also a Venezuelan public corporation); *Cooper/T. Smith Stevedoring, Inc. v. Ordaz,* 1997 WL 465290, at *5 (E.D.La. Aug.12, 1997) (plaintiff did not contest whether Venezuela was available and adequate forum).

court inadequate. *Piper,* 454 U.S. at 255, 102 S.Ct. 252. Also, adequacy is satisfied if the relevant type of case is "cognizable in theory" even in the absence of reference to any actual cases of the type. *Macedo v. Boeing Co.,* 693 F.2d 683, 688 (7th Cir.1982). Hence, Plaintiffs' contention that "[n]ot one Venezuela case has ever imposed product liability on a defendant who is *not* in possession or control of the instrument causing injury" is of no avail. Plaintiffs' Memo. at 20 (citing Rodner Aff. ¶ 12).

Plaintiffs also do not succeed on the basis of their expert opinion that "Venezuelan jurisprudence has not yet developed a defined set of substantive rules to govern traditional products liability for defectively designed or manufactured consumer products." Rodner Aff. ¶ 12. Defendants point to Article 1.185 of the Venezuelan Civil Code as evidence that Plaintiffs' claims are at least cognizable in theory. Cottín Dec. ¶¶ 16–17. According to Cottín, this law establishes that those causing harm to another through negligence or causing intentional harm to another are obligated to compensate the injured party. *Id.* Of course, for the reasons explained earlier, Cottín's expertise in this area is questionable. However, Defendants meet their burden of persuasion by relying on a prior publication authored by Rodner, Plaintiffs' expert, that contradicts the opinion he submits here. In the late 1970's, Rodner interpreted Article 1.185 of the Civil Code to establish a cause of action in product liability:

> Liability in tort is consecrated in Article 1.185 of the Civil Code .... If the damage caused to the victim comes from a manufacturing defect, the manufacturing defect is due to the fault of the manufacturer, and (sic [then?] ) the manufacturer must indemnify the victim for all damage, foreseen and even unforeseen, including pain and suffering ....

James O. Rodner, *Manufacturer's Liability in Venezuelan Law and Angel Rojo's Monograph,* Journal of the School of Law, Universidad Católica Andrés Bello, at 10 (1976–77). Thus, it appears that Plaintiffs would "not be deprived of all remedies or treated unfairly" if their cases could be brought in Venezuelan courts. However, because we find Defendants failed to meet their burden of persuasion that Venezuelan courts have jurisdiction over the cases, we must conclude that there is not an adequate alternative forum for these actions.

**Colombian Courts**

■ We next consider whether the Colombian court system provides an adequate alternative forum for the cases brought by Plaintiffs who are citizens and residents of Colombia. Unlike their argument against the Venezuelan courts, Plaintiffs essentially concede that all parties are amenable to process for these action in the courts of Colombia. Plaintiffs' Resp. at 20–21. Hence, we find that Colombia is available as an alternative forum. *Kamel,* 108 F.3d at 802 (citing *Piper,* 454 U.S. at 255, 102 S.Ct. 252).

With regard to adequacy, Plaintiffs raise two arguments in response to Defendants' attempts to demonstrate that these cases can be brought in Colombia. Citing the political instability and the pervasive influence of guerrilla violence in Colombia, they maintain that Colombian courts cannot provide an adequate alternative forum. Plaintiffs' Resp. at 20–21. As explained fully in the next section of this entry, we feel that this argument is best addressed as part of the balancing of public and private factors in favor of one forum over another. *See, e.g., Guidi v. Inter–Continental Hotels Corp.,* 224 F.3d 142, 145–48 (2d Cir.2000) (plaintiffs' safety concerns should be considered as part of the weighing of conveniences); *Iragorri v. Interna-*

*tional Elevator, Inc.,* 203 F.3d 8, 13 (1st Cir.2000) (opining that some safety concerns might better relate to balancing of interests) (*Iragorri I* ).[7] Therefore, we address only the second of the Plaintiffs' arguments against the adequacy of Colombian courts.

Plaintiffs contend that there is no established body of law governing consumer products liability in Colombian jurisprudence. Plaintiffs' Resp. at 21. Hernan Fabio Lopez Blanco, Plaintiffs' expert, opines that there is no substantive case law in the area of defective products and that there is an absence of rules and standards to guide Colombian courts if faced with a product liability case. Lopez Blanco Aff. ¶ 4.1. Specifically, Lopez Blanco maintains that Law 3466 of 1982, a consumer statute, is incomplete. *Id.* ¶ 4.3. According to him, the statute provides for fines, recalls, and sales prohibitions but fails to develop the manner in which recovery for injuries suffered by consumers for damages can be obtained in court. *Id.*

Defendants counter with the declaration of one of their experts, Juan Ignacio Gamboa Uribe. Gamboa calls our attention to a number of "Verbal Proceedings" brought before civil circuit judges against Ford Motor of Venezuela.[8] Gamboa Reply Dec. ¶ 2. He also sets forth the procedures involved in Verbal Proceedings, as established in Title XXIII of the Colombian Civil Procedure Code. *Id.* ¶ 3(c). It is certainly the case that these procedures differ from those in the district courts of the United States, but such differences do not render the courts of Colombia inadequate. *PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.,* 138 F.3d 65, 73 (2d Cir.1998) ("A forum is not inadequate even if the foreign justice system differs from that of the United States."); *Gschwind v. Cessna Aircraft Co.,* 161 F.3d 602, 607 (10th Cir.1998) ("[P]rocedural differences between forums do not bar a forum non conveniens dismissal in the absence of a 'complete denial of due process.' "). As noted earlier, the standard of adequacy is low. It is enough that the parties not be "deprived of all remedies or treated unfairly" and that the relevant type of case be "cognizable in theory." *Kamel,* 108 F.3d at 803; *Macedo,* 693 F.2d at 688. Here, Defendants meet their burden of persuasion on the question of adequacy. Gamboa's declarations establish that Columbian courts have procedures and substantive law capable of providing a remedy in product liability cases.

### Balancing the Interests

Once a district court determines whether an adequate alternative forum exists, then it is charged with balancing the private and public interest factors relevant to the choice of forum. *Kamel,* 108 F.3d at 803; *Piper,* 454 U.S. at 254–55, 102 S.Ct. 252. Private factors are usually analyzed separately from public factors. *E.g., Kamel,* 108 F.3d at 804 (determining district court adequately balanced private factors

---

**7.** There are two cases in two circuits reaching two different outcomes based on the same accident. Mauricio Iragorri, while visiting his mother in a partially finished apartment building in Cali, fell down an elevator shaft and died. In *Iragorri I,* his widow and children sued International Elevator, Inc., the maintenance contractor for the elevator, in the District Court of Maine. 203 F.3d at 10–11. The First Circuit upheld the lower court's decision to dismiss the case on the basis of forum non conveniens. In *Iragorri v.*

*United Technologies Corp.,* Mauricio's widow and children sued United Technologies Corp., the elevator manufacturer, in the District Court of Connecticut. 274 F.3d 65 (2d Cir. 2001) (*Iragorri II* ). The Second Circuit vacated and remanded the district court's decision to dismiss the case.

**8.** Ford Motor de Venezuela, S.A. does business not only in Venezuela, but also in Colombia.

before reviewing district court's balancing of public factors). Defendants continue to bear the burden of persuasion as to this element of the forum non conveniens analysis. *Lacey I,* 862 F.2d at 43–44.

Certain considerations carry more weight than others in the determination of whether Ford and Firestone have met their burden. Defendants must provide enough information to enable the court to balance the parties' interests. *Piper,* 454 U.S. at 258, 102 S.Ct. 252. At least "some idea of the type of evidence available" to establish key elements of the case must be provided to the court. *Macedo,* 693 F.2d at 689. For instance, some of the private interests to be considered include "the relative ease of access to sources of proof" and the availability of witnesses. *Gilbert,* 330 U.S. at 508, 67 S.Ct. 839. To balance these interests, the court needs information permitting it to "scrutinize the substance of the dispute between the parties to evaluate what proof is required, and determine whether the pieces of evidence cited by the parties are crucial, or even relevant, to the plaintiff's cause of action and to any potential defenses to the action." *Van Cauwenberghe v. Biard,* 486 U.S. 517, 528, 108 S.Ct. 1945, 100 L.Ed.2d 517 (1988). Both parties submitted voluminous evidence in support of their respective positions on the forum non conveniens motions.[9]

Another important consideration is the degree to which the balance of private and public interests must tip in order to warrant forum non conveniens dismissal. In *Kamel,* the Seventh Circuit formulated the issue in the following manner: "when a trial in the chosen forum would result in vexation and oppression to the defendant which would far outweigh the plaintiff's convenience or when the chosen forum would generate administrative and legal entanglements for the trial court," then dismissal is appropriate. 108 F.3d at 802. Interpretations of this language differ. Defendants maintain that they need show merely that the public and private factors "point towards" trial in Venezuela and Colombia. Joint Reply at 16. Plaintiffs argue that Defendants should be held to a higher standard such that the relevant interests must "clearly point towards" trial in the alternative forum. Plaintiffs' Resp. at 9.

■ The crux of the disagreement is the degree of deference to which Plaintiffs are entitled in their choice of forum. In *Piper,* the Supreme Court determined that "there is ordinarily a strong presumption in favor of the plaintiff's choice of forum, which may be overcome only when the private and public factors *clearly point towards* trial in the alternative forum." 454 U.S. at 255, 102 S.Ct. 252 (emphasis added). However, the Court limited the force of this presumption in a situation relevant here. The *Piper* court held that "the presumption applies with less force when the plaintiff [is] foreign." *Id.* The distinction is justified, in the Supreme Court's view, because the focus of the forum non conveniens inquiry is convenience and "[w]hen

---

**9.** Plaintiffs argue that Defendants fail to meet their burden because they presented much of their evidence for the first time on reply. Plaintiffs' Resp. at 3–4 n. 5. After Defendants filed their motions for dismissal on the basis of forum non conveniens, Plaintiffs asked the Court to set a discovery and briefing schedule on the forum non conveniens issue. We granted this motion on February 6, 2001, noting that "some discovery is necessary to

the consideration of Defendants' motions." *In re Bridgestone/Firestone, Inc.,* 131 F.Supp.2d at 1030. Plaintiffs cannot now seriously contend that they are to be the only beneficiaries of our earlier order permitting forum non conveniens discovery. Hence, we have ignored Plaintiffs' argument in this respect and have considered all of the evidence submitted by Defendants.

the home forum [of the plaintiff] has been chosen, it is reasonable to assume that this choice is convenient." *Id.* at 255–56, 102 S.Ct. 252. Presuming convenience is less reasonable when the plaintiff chooses a foreign forum. *Id.* at 256, 102 S.Ct. 252.

On the basis of certain treaty obligations, the Colombian and Venezuelan Plaintiffs before us maintain that they are entitled to a presumption of convenience equal to that of resident or citizen plaintiffs. Plaintiffs' Resp. at 14. The United States and Venezuela signed a Treaty of Peace, Friendship, Navigation and Commerce on January 20, 1836. 8 Stat. 466, 1836 WL 3643. Article 13 of the treaty provides that the courts of both countries shall be "open and free" to the other's citizens "on the same terms which are usual and customary with the natives or citizens of the country in which they may be ...." A similar treaty was signed between the United States and Colombia (then New Granada) on December 12, 1846.[10] Article 13, Treaty of Peace, Amity, Navigation and Commerce, 9 State. 881, 1846 WL 6378. Plaintiffs' reasoning is persuasive. Indeed, in reference to the treaty with Venezuela, one court took Plaintiffs' position, determining that "no discount may be imposed on the [Venezuelan] plaintiff's initial choice of a [United States] forum solely because [the plaintiff]

is a foreign corporation." *Blanco,* 997 F.2d at 981. In opposition, Defendants maintain that the U.S. treaties with Venezuela and Colombia are not relevant to the forum non conveniens question and that they need only show that the balance of public and private factors simply "point towards" trial in the foreign forums. Joint Reply at 15–16. They contend that *Blanco* and cases reaching similar holdings are directly counter to *Piper* and *Kamel,* the controlling precedents in this jurisdiction. However, no treaties were mentioned, let alone considered and rejected, in *Piper* and *Kamel.*

▌ Rather than adopting wholesale either Defendants' or Plaintiffs' approach, we will use the more nuanced approach suggested by *Iragorri II* and other precedents: expatriate U.S. nationals and treaty nationals residing in their home countries are entitled to the same deference on their choice of forum, with the consideration that suing in a United States forum while residing in a foreign country is less likely to be convenient. This formulation accommodates a number of conflicting values, including protecting U.S. courts from a glut of foreign cases while continuing to respect our treaty obligations. *See Piper,* 454 U.S. at 252, 102 S.Ct. 252 (acknowledging concern about any decisions which would make American courts even more

---

**10.** Defendants question whether the friendship treaty with Colombia, in particular, should have an impact on the forum non conveniens analysis. Joint Reply at 15 n. 7. Defendants' contention is based on a careless reading of the case on which they rely, *Iragorri II,* 274 F.3d 65. Specifically, Ford and Firestone misquote what they admit is dicta as follows: "the instant case [involving a Colombian national] does not implicate any treaty obligations." Joint Reply at 15 n. 7 (misquoting *Iragorri II,* 274 F.3d at 69 n. 2) (insertion in Defendant's quotation). However, the court in *Iragorri II* did not say, as Defendants contend, that no treaty obligations were implicated because the treaty

with Colombia was irrelevant or somehow ineffective. Instead, in *Iragorri II,* no treaty obligations were implicated *because* the plaintiffs in the case *were not Colombian nationals.* As a close reading of the case reveals, the *Iragorri II* plaintiffs were U.S. nationals. *See also Iragorri I,* 203 F.3d at 10–11 ("A native of Colombia, Iragorri emigrated to the United States with his wife and two young children in the early 1980s ... and all four *became naturalized citizens* in 1989.") (emphasis added). As U.S. citizens, the Iragorris did not need to rely on the treaty in order to claim any entitlement to the presumption that the forum they chose was convenient.

attractive to foreign plaintiffs, especially considering that American courts are already crowded); *Alcoa Steamship Co., Inc. v. M/V Nordic Regent*, 654 F.2d 147, 153 (2d Cir.1980) (noting that treaty obligations are paramount under the Constitution); *Iragorri II*, 274 F.3d at 69 n. 2 (Department of Justice opined that "nationals of the other party to the treaty are entitled to access to U.S. courts on terms no less favorable than those enjoyed by U.S. nationals *in like situations.*") (emphasis added). It also follows the widely recognized principle that not even U.S. citizenship is a talisman against forum non conveniens dismissal. *Piper*, 454 U.S. at 256 n. 23, 102 S.Ct. 252 ("A citizen's forum choice should not be given dispositive weight . . . ."); *see also Kamel*, 108 F.3d at 804 (certain situations merit discount of plaintiff's American citizenship). And, ultimately, it captures the main point of our analysis—convenience. Hence, we conclude that Plaintiffs here are entitled to the same deference as U.S. citizens *in similar situations*, with the understanding that suing in a United States court is sometimes, although not always, less likely to be convenient when the shared situation is residence in a foreign country. *See Doe v. Hyland Therapeutics Division*, 807 F.Supp. 1117, 1123 n. 9 (S.D.N.Y.1992) ("Moreover, circumstances may indicate that the chosen forum, though foreign, is still more convenient to the plaintiff than the home forum."). Hence, the balance of private and public interest factors must do more than merely "point towards" further proceedings in Venezuela and Colombia.

### Private Interest Factors—Colombia

■ Keeping in mind the degree of deference properly accorded Plaintiffs, we examine the private interest factors having an impact on the choice of forum. All of the Colombian cases were filed in the Southern District of Florida and likely would be remanded there for trial. For this reason, the forum to which we compare the Colombian courts is the district court in southern Florida. Important considerations concerning the private interests of the litigants include "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive [including] questions as to the enforcibility [sic] of a judgment if one is obtained." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947).

■ We look first at ease of access to sources of proof, including documents and witness testimony, as they are often considered together. *See, e.g., Roynat v. Richmond Transp. Corp.*, 772 F.Supp. 417, 422 (S.D.Ind.1991). Defendants attempt to tilt this factor in their favor through their willingness to accommodate the participation of foreign Plaintiffs in pretrial proceedings in the MDL and to make available any evidence produced through coordinated discovery. Ford Memo. (Colombian Cases) at 12 n. 8; Joint Reply at 21–22. There are problems with this seemingly generous offer.[11] Most impor-

11. Especially curious is Defendants' offer to "accommodate the participation of these plaintiffs in pretrial proceedings before this Court . . . ." Ford Memo. (Colombian Cases) at 12 n. 8. "The principle of forum non conveniens is simply that a court may *resist imposition upon its jurisdiction* even when jurisdiction is authorized by the letter of a general venue statute." *Gilbert*, 330 U.S. at 507, 67 S.Ct. 839 (emphasis added). If we were to dismiss these cases on the basis of forum non conveniens, we would no longer have jurisdiction over these Plaintiffs. For that matter, we would not have jurisdiction over Defendants with respect to these cases. *Id.; see also In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India in December, 1984,*

tantly, certain types of discovery conducted here may not be usable in a Colombian proceeding. Lopez Blanco opines that expert testimony developed abroad must be presented again before the Colombian judge with an opportunity for contradiction of the evidence. Lopez Blanco Aff. ¶ 5.5.[12] It also appears that answers to interrogatories and requests for admission would be of no use in a Colombian trial. Lopez Blanco Aff. ¶ 5.5 (written testimony permitted only from diplomatic agents and their dependents). Finally, use of deposition testimony is problematic, at best. Parties can request ratification before a Colombian judge of oral testimony given abroad.[13] *Id.* Ratification entails travel to Colombia by the witness and testimony through an interpreter, if necessary, regarding the earlier testimony. *Id.* The opinions of Gamboa and Lopez Blanco permit the conclusion that documents (unlike deposition testimony and expert reports)

obtained in the MDL could be presented in a Colombian proceeding. We nonetheless conclude that Defendants' offer to make discovery available to foreign Plaintiffs does not establish that there will be meaningful ease of access to the evidence collected in the consolidated proceedings before us.[14]

Of course, there is other evidence that will be important to the Colombian cases, some of which is more readily available in Colombia. The question before us concerns the relative importance of evidence available in the possible forums. *See, e.g., Reid–Walen v. Hansen,* 933 F.2d 1390, 1396 (8th Cir.1991) ("[T]he district court must examine the materiality and importance of the anticipated witnesses' testimony and then determine their accessibility and convenience to the forum."). We look at the theories the parties may seek to prove at trial to determine the importance

809 F.2d 195, 205 (2d Cir.1987) ("Once [a district court] dismisses those proceedings on grounds of forum non conveniens it ceases to have any further jurisdiction over the matter unless and until a proceeding [is] brought to enforce [a final judgment]."); *but cf. Chesley v. Union Carbide Corp.,* 927 F.2d 60, 65 (2d Cir.1991) (forum non conveniens dismissal not an absolute bar to future jurisdiction in certain situations, none of which are applicable here). It seems possible that Colombian Plaintiffs would seek evidence not discoverable in the domestic cases. But if these Plaintiffs were kibitzing the proceedings by Defendants' invitation, it would be problematic if they filed a discovery motion with the Court when we no longer have jurisdiction over the heart of the dispute.

12. In contrast, Defendants' expert claims that parties may voluntarily submit expert opinions. Gamboa Dec. ¶ I.B.6. Both foreign law experts cite different statutes for support of their propositions, but Defendants, who have the burden of persuasion, fail to respond on reply to Lopez Blanco's statement and citation.

13. Defendants respond with testimony from Gamboa. He states that parties cannot re-

quest ratification for "depositions that have been *produced* in *another judicial proceeding* with participation of the defendants." Gambo Reply Dec. ¶ 4 (emphasis added). This rejoinder raises more questions than it answers. A great many depositions, while taken under judicial auspices, are never offered as evidence in court. Gamboa does not offer an opinion on how Colombian courts define "produced" or "another judicial proceeding," and we are not inclined to assume that a Colombian judge would accept depositions taken as part of MDL discovery.

14. It is not clear from the expert testimony what the standard is for presenting evidence in Verbal Proceedings. We need not decide whether it differs from standard U.S. trials, however. While the availability of Verbal Proceedings meets the minimal standard required to demonstrate adequacy, the relative convenience standard for balancing the private interests is more demanding, and Defendants have not provided enough information to allow us to conclude that Verbal Proceedings would protect the private interests of the parties.

and availability of possible evidence. *E.g., Macedo,* 693 F.2d at 688–89 (determining location of damage evidence and then considering where liability evidence most accessible).

Liability, for instance, will be a major source of contention at the trials of these cases. Of course, in all cases, Plaintiffs must prove that the vehicles and/or tires were defective and the proximate cause of injuries. In some cases, Ford and Firestone may contest liability on the grounds that vehicle maintenance or repair deficiencies were at fault in the accidents. *See* Esworthy Aff. ¶ 9 (Supp.App. K). While some records and testimony concerning vehicle and tire service history have already been produced, additional records are likely to be in Colombia. *See, e.g.,* Supp.App. B., Box 117, Document # 17171. This argument does not persuade us that relatively significant portions of material evidence are available only in the alternative forum.[15] *Cf. Piper,* 454 U.S. at 257, 102 S.Ct. 252 (discussing location of "large proportion" of relevant evidence). Many of the service providers for the Rodriguez[16] and Escobar/Iragorri[17] vehicles and tires are Ford dealerships, raising the possibility that Ford has access to this information through its business channels. Most importantly, Ford and Firestone make no allegations specific to any of these Colombian cases that improper service conditions played a role in the accidents. *Cf. Lacey v. Cessna Aircraft Co.,* 932 F.2d 170, 182 (3d Cir.1991) (*Lacey II* ) (commending district court for finding *support* for both plaintiff's products liability claim and defendants' assertions of pilot error and negligent maintenance before proceeding to examine where necessary proof was located). Even if they did, we are not certain that evidence from Colombian service stations, for instance, would tip the scale in favor of a Colombian forum. It is likely that expert testimony about the increased risk of accidents resulting from improper service conditions would be crucial and would come from the United States. *See* Lopez Blanco Aff. ¶ 4.2 n. 2 ("[*In Atomundial v. BF Goodrich–Icollantas,* a case brought in Colombia,] it became necessary to dispense with expert testimony because there was no one in the country, other than parts technicians, qualified to discuss the quality, specifications and durability of tires . . . .").

Instead, Plaintiffs make a convincing case that much of the evidence regarding liability is in the United States. The vehicles in both the Rodriguez cases and the Escobar/Iragorri cases were manufactured in the United States, as were the tires in the Rodriguez cases. Because of their American manufacture, most of the documents and witnesses related to the design,

---

**15.** Some evidence on this point does not seem to be available at all. For instance, the vehicle and tires in one set of cases were disposed of by an insurance company. Plaintiff's Executed Answers to Forum Non Conveniens Interrogatories # 3, *Escobar v. Bridgestone/Firestone, Inc., et al.,* IP 00–5089–C–B/S. An interview with the agent who disposed of the tires and vehicle probably would not replace an examination of the tires since, according to Esworthy, a complete forensic examination of each tire, using laboratory equipment at the technical center in Akron, Ohio, is the normal procedure. Esworthy Aff. ¶ 7.

We also note that this problem is not limited to foreign cases. For example, in IP 01–5352 (Wood), the repair shop disposed of Plaintiff's tire. *Entry on Pending Motions,* Magistrate Judge Shields, Feb. 15, 2002.

**16.** The Rodriguez cases are IP 00–5083, IP 00–5090, and IP 00–5099. Tatiana Rodriguez sues on her own behalf or on behalf of others in all of these cases.

**17.** The Escobar/Iragorri cases are IP 00–5089 and IP 00–5098. Monica Escobar Roldan was an occupant of the Explorer involved in the accident. Mauricio Iragorri Rizo was the driver and owner of the Explorer.

testing, and accident rates of these products are in this country.[18] As noted before, while the relevant documents could be transported to Colombia without much inconvenience, crucial expert reports and deposition testimony probably could not be made available in Colombian courts, demonstrating that the bulk of relevant liability evidence is more accessible in the United States.

Evidence on "actual damages"[19] and "moral damages"[20] also will be important to these cases. Damages evidence, consisting of medical and employment records, tax returns, testimony from medical providers, and the like, originate in Colombia, although some of these documents already have been produced here in the United States. *See, e.g.,* Supp.App. B, Box 117, Document # 17195. We do not find that the importance of the evidence remaining in Colombia outweighs that of the evidence relating to liability, most of which is in the United States. This conclusion is especially clear if we address these cases individually, rather than en masse. In each case, the amount of evidence related to that particular Plaintiff's injuries, for instance, likely will be less than the amount of evidence needed to determine whether the tires and/or the Explorer were defective. In sum, ease of access to proof weighs in favor of retaining jurisdiction in the United States.

Defendants also fail to show that considerations of compulsory process and the cost of transporting witnesses favor trial in the alternative forum. Defendants point out that no American court will be able to compel testimony of non-party witnesses in Colombia, such as accident witnesses or witnesses providing medical treatment to Plaintiffs. Ford Memo. (Colombia) at 13–14.[21] Of course, the inability to present evidence necessary to the parties' positions presents a serious inconvenience to trying the cases in the United States. However, letters rogatory, while a potentially cumbersome process, may be used to secure video depositions of Colombian witnesses unwilling to provide testimony in a U.S. trial.[22] *See DiRienzo v. Philip Services Corp.,* 232 F.3d 49, 66–67 (2d Cir.2000) (error to fail to consider ability to obtain witness testimony through letters rogatory). Moreover, as we explained above,

---

18. The tires on the vehicle in the Escobar/Iragorri cases were manufactured in Venezuela, not Colombia or the United States, by Bridgestone/Firestone Venezolana, C.A. Because so much of the design of Firestone tires took place in the United States, a great deal of the evidence concerning alleged design defects is also here. *See* Gonzalez Dep. at 514 (noting that Firestone tires to be utilized on Explorers in Venezuela were designed by Bridgestone/Firestone, Inc., the U.S. division of the company).

19. Actual damages includes damages to property, loss of profit or income, hospital expenses, medical expenses, etc. Suárez–Camacho Dec. ¶ 19; Gamboa Dec. ¶ 14.

20. Colombian law recognizes moral damages, permitting recovery for intense pain and suffering and loss of affection. Suárez–Camacho Dec. ¶ 20; Gamboa Dec. ¶ 14.

21. We note that the availability of compulsory testimony from non-party witnesses in Colombia is not assured. While the expert affidavits here demonstrate that live witness testimony is important in Colombian courts, *see* Lopez Blanco Aff. ¶ 5.5, they tell us nothing about how Colombian courts gather this testimony from unwilling witnesses. Colombia is not an undifferentiated land mass. Like the United States, it has states or "departmentos." It also has civil judges with jurisdiction in their different circuits. Gamboa Dec. ¶ I.A.2. It is not clear from the evidence before the Court whether a Colombian court can compel testimony from those witnesses who reside in other jurisdictions within Colombia.

22. Of course, some of these witnesses may be willing to testify in the Southern District of Florida.

deposition testimony from U.S. liability witnesses might not be admitted in Colombian proceedings. In such situations, Colombian courts will be unable to exercise compulsory jurisdiction over such witnesses if they are unwilling to travel to Colombia.[23] In *Reid–Walen*, the Eighth Circuit found this factor to be a draw, opining that "[i]f the suit is brought in the U.S., the parties will not have compulsory process over Jamaican witnesses. By the same token, if the suit is brought in Jamaica, the parties will lack compulsory process over American witnesses." 933 F.2d at 1397. Likewise, considerations of the cost of transporting willing witnesses are a wash. In the absence of a clear picture of how many witnesses important to each case are in the United States as compared to the number in Colombia, this factor does not tilt in either direction. Furthermore, it does not seem likely that it would be more costly to travel from the United States to Colombia for trial and home again than it would be to travel from Colombia to the United States for trial and home again.

View of the accident scene is possible only if the trial is held in Colombia. Ford and Firestone maintain that the driving conditions to which the vehicles and tires were subjected, rather than a design defect, caused the accidents at issue in these cases. Joint Reply at 25. In such situations, a view of the premises is appropriate, and this factor weighs in favor of the alternative forum. *Danser v. Firestone Tire & Rubber Co.*, 86 F.R.D. 120, 123 (S.D.N.Y.1980) (view of accident scene may be helpful in resolving whether tire rupture caused accident or occurred because of accident, as alleged by defendant); *see also Cooper/T. Smith*, 1997 WL 465290, at *5 (view of barge relevant when accident allegedly caused by conditions on barge).

We next examine "all other practical problems that make trial of a case easy, expeditious and inexpensive." A host of considerations fall under this rubric, and while not all of them suggest that trial in Colombia would be inconvenient, the sum of them favors retaining these cases for trial in the United States. One frequent consideration, enforceability of judgment, is neutral. *See Gilbert*, 330 U.S. at 508, 67 S.Ct. 839 (trial in foreign jurisdiction less convenient if there are questions as to whether a judgment obtained there could be enforced). Defendants "explicitly consent that any dismissal be conditioned upon their agreement to satisfy any final judgment entered by the courts of Venezuela or Colombia in favor of the plaintiffs." Joint Reply at 26. This consent alleviates the concern about satisfying a final judgment because such conditions often are attached to dismissal on the basis of forum non conveniens. *Gschwind*, 161 F.3d at 607 (approving district court's dismissal of case on condition that defendants consent to have action reinstated if foreign court refuses jurisdiction); *Roynat*, 772 F.Supp. at 423 (dismissing case with condition that defendant consent to jurisdiction

---

**23.** In opposition to Plaintiffs' argument that trial in the United States would provide greater access to U.S. sources of proof, Ford and Firestone argue that "none of the witnesses employed by Ford and Firestone work or reside within the subpoena power of the U.S. district court here in Indianapolis or within the subpoena power of the federal court in which these actions were originally filed and to which [they] will likely be remanded." Joint Reply at 22. While this statement is accurate, it is not persuasive. Ford and Firestone have the ability to produce their own employees for deposition or trial without the benefit of subpoenas. Furthermore, U.S. courts, unlike Colombian courts, readily accept deposition testimony when the witness is beyond the reach of compulsory process. Fed. R.Evid. 804(a)(5) and (b)(1). Provided that the witnesses can be deposed, none of the parties would be without the benefit of these witnesses' testimony for a U.S. trial.

of foreign court and not raise any statute of limitations defense available under foreign law). Because any judgment rendered in a U.S. forum also could be easily enforced, Defendants' concession equalizes the two forum choices with respect to this issue.

Among the private interests factors, courts also must consider the inability to implead potential third-party defendants. *Piper*, 454 U.S. at 259, 102 S.Ct. 252. In the Rodriguez cases and the Escobar/Iragorri cases, Defendants list as potential third-party defendants a number of service stations and dealerships which allegedly performed maintenance on the tires or vehicles and Bridgestone/Firestone Venezolana which manufactured the tires at issue in the Escobar cases. Supp.App. A (entries # 116–# 120 (citing Answers to Forum Non Conveniens Interrogatories)). They also list the drivers of vehicles involved in the accidents as third-party defendants in the cases in which the driver is not also a plaintiff. *Id.* Finally, included as possible third-party defendants, according to Ford and Firestone, are the dealerships, individuals, and/or retail tire establishments that sold the tires and vehicles at issue in these cases. Defendants argue that these third parties are not subject to the jurisdiction of United States courts and are potentially responsible for the accidents allegedly injuring Plaintiffs. Joint Reply at 27. They maintain that Colombia is a more convenient forum because it would permit them to implead these third parties. This factor favors dismissal. *See Piper*, 454 U.S. at 259, 102 S.Ct. 252 (resolving all claims in one trial more convenient than finding liability in United States and suing for indemnity or contribution in foreign forum).

Also worthy of consideration is the expense and inconvenience of translation. *Macedo*, 693 F.2d at 690; *see also Blanco*, 997 F.2d at 982. Regardless of where the cases are tried, some evidence will be presented in translation. On the one hand, English translations of medical testimony, service records, and the like would be required for proceedings in the Southern District of Florida. On the other hand, Colombian courts would require Spanish translations of documents and testimony concerning defect. Lopez Blanco Aff. ¶ 5.5 (citing Colombian Code of Civil Procedure, Art. 260). In this situation, the burden on the parties if the trial is held in Colombia cannot be ignored. *Hull 753 Corp. v. Elbe Flugzeugwerke GmbH*, 58 F.Supp.2d 925, 929 (N.D.Ill.1999). Indeed, the best course is to weigh the amount of evidence that must be translated if the trial remains in the U.S. forum against the amount of evidence to be translated if the trial is held in a foreign forum. *See Prevision Integral de Servicios Funerarios, S.A. v. Kraft*, 94 F.Supp.2d 771, 779 (W.D.Tx.2000) (noting that, despite defendants' contentions, only one key document would require translation if court retained jurisdiction, a factor weighing against forum non conveniens motion). As expected, both parties argue that the burden of translation is lightest for their respective preferred forums. Plaintiffs make the more persuasive argument.

Millions of documents in English concerning liability have been produced by Ford and Firestone into the document depositories for this MDL. As Defendants correctly contend, at the time of the briefing on forum non conveniens, only about 2,000 of these documents had been marked as deposition exhibits, and at a trial, it is likely that even fewer documents would be introduced into evidence. Even with this discounted number of English-language liability documents, we find, nevertheless, that the translation burden of trying these cases in the Southern District of Florida is less than if the cases were tried in Colombia. First, translating even "several hun-

dred" liability documents, as Defendants estimate, would be no small task. Second, most liability documents from Ford Motor de Venezuela and Bridgestone/Firestone Venezolana were originally authored in English or have already been translated from Spanish to English, and liability witnesses were deposed in English, via translation. *See* Quinlan Aff., MDL Docket No. 1394. For those cases in which Ford and Firestone plan to defend by pointing to poor driving of other parties, the accident report has already been translated into English. Plaintiffs/Firestone Stips. ¶ 10. While Plaintiffs' prior medical histories probably are primarily in Spanish, records of subsequent treatment are in both English and Spanish. *Id.* ¶ 11. Of course, depending on Defendants' strategy, the testimony of accident witnesses and maintenance records must be translated into English for a U.S. trial, but, *for each case,*[24] the amount of such evidence will be considerably less than the amount of evidence needed to prove defect and damages, the vast majority of which is in English.

As part of the balancing of conveniences, we also factor in physical threats to litigants and witnesses arising from the current volatile political situation in Colombia. In *Iragorri II,* the Second Circuit instructed the lower court that plaintiffs' fears for their safety in Cali, if warranted, were "highly relevant to the balancing inquiry." 274 F.3d at 75; *see also Guidi,* 224 F.3d at 147 (attacks on tourists in

Egypt should be considered in the balancing of conveniences). We find that Plaintiffs' concerns are warranted. As recently as February 20, 2002 the Colombian government called off peace talks with Fuerzas Armadas Revolucionarias de Colombia[25] (FARC). U.S. Dep't of State Public Announcement on Colombia, 2/2/02. Since the collapse of peace talks, "[t]he security situation in Colombia has worsened." *Id.* Two government officials, Senator Jorge Eduardo Gechem Turbay and Senator Ingrid Betancourt, also a presidential candidate, were kidnapped in late February. Juan Forero, *Colombian Rebels Hijack a Plane and Kidnap a Senator,* N.Y. Times, Feb. 21, 2002, at A1; Juan Forero, *Colombian Rebels Sabotage Peace Hopes,* N.Y. Times, Feb. 25, 2002 at A1.[26] Bombing and sabotage attacks on infrastructure have interrupted electricity, water, and phone services in a number of cities and towns across six provinces. Juan Forero, *Colombian Rebels Step Up Pace and Intensity of Attacks,* N.Y. Times, Mar. 4, 2002 at A1. For the purposes of our inquiry, of particular interest is the fact that, in the recent past, judicial officers have been the targets of guerilla violence. Amnesty International Report 1998: Colombia (1998) at http://www.amnesty.org.ailib.aireport/ar98/amr23.htm.

Defendants argue that a similar argument was rejected in *Iragorri I.* Joint Reply at 19–20 (citing *Iragorri I,* 203 F.3d at 13). However, two important distinc-

---

**24.** To a great extent, each case is entitled to a weighing of the burdens as they relate specifically to it. *See In re Silicone Gel Breast Implants Products Liability Litig.,* 887 F.Supp. 1469, 1478 (N.D.Ala.1995) (after dismissing group of foreign plaintiffs on grounds of forum non conveniens, noting that any foreign citizen who received breast implants in the United States could file a Rule 59 motion as to her case). We examine the motions before us in one entry because there are many similarities among them, not because each case

necessarily is affected by the facts or the procedural situations of the other cases.

**25.** Revolutionary Armed Forces of Colombia.

**26.** Federal Rule of Evidence 201 authorizes a court to take judicial notice of facts "not subject to reasonable dispute" because they are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

**1144**

tions separate *Iragorri I* from the situation we consider here. First, *Iragorri I* was decided well over two years ago. Since then, the situation in Colombia appears to have worsened. It was only one month ago that President Pastrana called off talks with FARC and that violence in the region increased. Considering recent developments in the alternative forum is in keeping with the crux of the forum non conveniens inquiry—convenience. *Cf. Aguinda v. Texaco, Inc.*, 2000 WL 122143, at \*1–2, 2000 U.S. Dist. LEXIS 745, at \*4–8 (S.D.N.Y.2000) (requesting additional briefing on adequacy of alternative forum in light of military coup in Equador, the proposed alternative forum).

Second, in *Iragorri I*, the First Circuit held that it was not an abuse of discretion to find that Colombia was an adequate alternative forum despite political instability and violence. 203 F.3d at 14. Rather than finding that Colombia is not an adequate alternative forum on this basis, we conclude only that these problems make trial there less convenient.[27] In *Guidi*, the plaintiffs were a shooting victim and the widows of two other shooting victims attacked by an Egyptian gunmen at the Semiramis Inter–Continental Hotel in Cairo. 224 F.3d at 143–44. The Second Circuit held that the plaintiffs' fears of litigating in a country where foreigners have been the target of hostile attacks were an important reason for keeping the case in the chosen forum of New York, especially where the plaintiffs themselves had suffered the effects of one such attack already. *Id.* at 147. Likewise, in *Iragorri II*, the Second Circuit held that the district court must at least consider in the balancing of conveniences the plaintiffs' safety fears and the possibility that witnesses may be unwilling to travel to Colombia due to political unrest. 274 F.3d at 75. Following this lead, we find that the political instability and violence in Colombia, especially in light of the worsening situation since the collapse of peace talks,[28] is a factor weighing in favor of retaining jurisdiction over these cases in U.S. courts.

We find that the balancing of the private interest factors weighs in favor of retaining jurisdiction in the United States. While certain factors favor dismissal, we conclude that these factors are not as weighty as those factors favoring retention of jurisdiction over the cases. For instance, the possibility of viewing the premises if the trials are in Colombia is not a strong factor in Defendants' favor. Their argument that a view of the accident scene is necessary boils down to the supposition that it "would be difficult for an American to imagine" conditions like "[h]igh-speed driving over road conditions with steep shoulders with sharp drop-offs." Joint Reply at 25. Ford and Firestone underestimate both their lawyers' rhetorical capabilities and the typical American juror's ability to understand and even to imagine. Other courts deciding forum non conveniens motions have found that this factor carries little weight when other media are available. *See, e.g. Reid–Walen*, 933 F.2d at 1398 (boating accident scene could be established "through aerial photographs and other demonstrative evidence or testi-

---

27. This focus on practicalities at this stage of the analysis is appropriate in a circuit where, as here, the adequate alternative forum inquiry is formalistic. *See Macedo*, 693 F.2d at 688 (it is enough that case be "cognizable in theory" in proposed alternative forum). Even the court in *Iragorri I* thought that these concerns were more appropriately considered in the second-stage balancing than in the determination of whether there is an adequate alternative forum. 203 F.3d at 14.

28. At the time of the Second Circuit's decision in *Iragorri II* finding that the Colombian political situation must be considered, FARC and Pastrana's government continued to engage in negotiations.

mony"); *Massaquoi v. Virgin Atlantic Airways*, 945 F.Supp. 58, 62 (S.D.N.Y. 1996) (pictures or videotape adequate to show emergency airplane exit slide involved in flight attendant training exercise resulting in physical injury). The ability to implead third parties also does not carry the day for Defendants. Most importantly, Ford and Firestone do not provide any evidence specific to the Rodriguez and Escobar/Iragorri cases to support their general allegation that the tires and vehicles were improperly serviced, that the drivers involved in the accidents were negligent, or that the sellers of the vehicles and tires engaged in any actionable activity.[29] While we are not to entangle ourselves in the merits of the underlying dispute at this stage of the proceedings, more than general allegations are needed to support Defendants' claim that third parties were responsible for Plaintiffs' injuries. *See Lacey II*, 932 F.2d at 182 (approving of lower court's finding that evidence supported defendants' third party liability argument only after lower court examined defendants' affidavits in support of contention).[30]

We summarize our analysis above: certain factors come out as a wash—witness availability and enforceability of judgment. Two factors favor trial in Colombia—possibility of view of the premises and ability to implead third parties. However, three more crucial factors indicate that trial in the United States is more convenient—access to proof, the expense and burden of translation, and the political instability and threats of violence in Colombia. In balancing these factors, we regard the latter as particularly weighty, given the facts before us. Thus, the private interests factors dictate that Defendants' motion should be denied.

### Public Interest Factors—Colombia

 Next we consider the public interest factors. The public interest factors focus on the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty. *Piper*, 454 U.S. at 241 n. 6, 102 S.Ct. 252 (citing *Gilbert*, 330 U.S. at 509, 67 S.Ct. 839).

 First, we examine the respective local interests in these cases. Ford and Firestone argue that only the interests of

---

**29.** Defendants' expert, Esworthy, cites only Venezuelan cases in his affidavit as examples of cases where inspection revealed obvious damage and inappropriate service conditions on the tires. Esworthy Aff. ¶ 9. No evidence has been presented that another vehicle was involved in the Escobar/Iragorri accident or that Mauricio Iragorri Rizo, the driver of the Explorer, was negligent. *See* Defendants' Supp.App. A, # 117, 119 (citing Plaintiffs' Answers to Interrogatories). While there was a tractor-trailer involved in the Rodriguez accident, Ford and Firestone have come forth with no evidence that the drivers of the tractor-trailer or of Ford vehicle were negligent.

**30.** We also note that under Colombian law, tortfeasors are jointly and severally liable,

suggesting that Plaintiffs, barring contributory negligence and assuming attribution of fault to Firestone or Ford, could recover from either Firestone or Ford the entire amount awarded, regardless of whether third parties were part of the proceedings. Suárez–Camacho Dec. ¶ 16–17 (citing Colombian Civil Code Art. 2344 and 2357). Defendants have presented no expert testimony that Colombian law provides for a right of contribution, weakening Ford and Firestone's argument that they would be prejudiced by the inability to implead third-party defendants. Moreover, even if they can seek contribution, they can do so in a separate action.

Colombia are implicated in these actions. Joint Reply at 31. The accidents occurred on the roads and highways of Colombia, and the impact of medical treatment and economic loss is felt only in Colombia. *Id.* Certainly, Colombia has an interest in protecting the lives and health of those who use its highways and an interest in determining the extent of damages payable to those injured in these accidents. *See Leon,* 251 F.3d at 1315. Contrary to Defendants' assertions, however, the United States has some interest in the resolution of these cases.[31] A few courts recite the maxim that "[t]he defendant's home forum always has a strong interest in providing a forum for redress of injuries caused by its citizens." *Reid–Walen,* 933 F.2d at 1400. *Kamel* suggests that this maxim has less weight where, as here, Defendants are American corporations with extensive foreign business dealings, 108 F.3d at 804, but the U.S. interest in this case extends beyond the general notion that our corporations can be held accountable in United States courts for injuries caused to foreign nationals. Plaintiffs present evidence that Ford and Firestone's early warning of alleged serious problems with their products stemmed from reports of unusually high accident rates in South America and other foreign markets. *E.g.,* DaSilva Dep. at 112–116 (in October of 1998, Ford Venezuela began receiving reports of tire failures that were conveyed, within months, to Ford and Firestone officials in the United States). American interest in Ford and Firestone's investigations of these accidents has been high, on the theory that had the public and the relevant government agencies known of the problems sooner, fewer deaths and serious injuries would have occurred on U.S. highways. In fact, this topic was the subject of congressional committee hearings in the fall of 2000. *See, e.g.,* Prepared Statement of Dr. Sue Bailey, Administrator, National Highway Traffic Safety Administration to the Joint Hearing of the Subcommittee on Telecommunications, Trade & Consumer Protection and the Subcommittee on Oversight & Investigations, attached as App. 1 to Defs.' Memo. in Opp. to Class Pls.' Mot. for Prelim. Inj. Both Colombia and the United States have legitimate interest in these cases such that this factor does not weigh heavily in favor of Defendants' position on forum non conveniens.

Defendants argue that the need to apply Colombian law in these cases strongly counsels in favor of dismissal. Ford Memo. (Colombian Cases) at 16. According to Ford and Firestone, granting the forum non conveniens motions would solve two related problems mentioned in *Piper.* First, the Southern District of Florida, the federal court from where these Colombian cases originated and where they will be tried absent forum non conveniens dismissal, is not familiar with the law of Colombia. *See Bhatnagar,* 52 F.3d at 1226 n. 5 ("[C]ourts should prefer to have cases adjudicated in the forum familiar with the law to be applied, instead of taking it upon

---

**31.** Firestone maintains that the only connections these cases have with Florida "are that the defendants' [sic] conduct business in Miami and that the plaintiffs' attorneys are located in Miami." Firestone Memo. at 17. Florida's interest in these cases is not unrelated to the interest of the United States as a whole. *See DiRienzo,* 232 F.3d at 62 ("*This country's federal courts* have a stronger relation to the class as a whole than do Ontario's courts.") (emphasis added). Furthermore, transfer to a possibly more appropriate federal court under 28 U.S.C. § 1404 appears to be beyond our power at this point. *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26, 40 n. 4, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998) ("*Because we find that the statutory language of § 1407 precludes a transferee court from granting any § 1404(a) motion,* we have no need to address the question whether § 1404(a) permits self-transfer given that the statute explicitly provides for transfer only 'to any other district.' ") (emphasis added) (citation omitted).

themselves to become educated about foreign law."). Second, Defendants argue that dismissing these cases would "avoid[ ] unnecessary problems in conflict of laws, or in the application of foreign law." *See Piper*, 454 U.S. at 241 n. 6, 102 S.Ct. 252 (citing *Gilbert*, 330 U.S. at 509, 67 S.Ct. 839).

This factor is not as clearly in Defendants' favor as it might appear to be at first blush. Ford and Firestone do not argue that foreign law applies to all issues in the cases. Instead, Defendants contend that Colombia supplies the substantive law applicable to the issues of liability and compensatory damages. Joint Reply at 35. According to Defendants, under Florida's choice of law rules, the law of Michigan applies with respect to punitive damages claims against Ford. Memo. in Supp. of Def. Ford's Mot. to Strike Pls.' Req. for Punitive Damages or, in the Alternative, for Part. Summary Judgment in Favor of

Ford on Pls.' Req. for Punitive Damages at 3–4.[32] This concession reduces the potential for problems in conflict of laws or in the application of foreign law.[33] By Defendants' reasoning, on some issues, at least, the parties and the Florida court will not face the burden of translating, interpreting, and applying the law of Colombia.

We look next at the administrative difficulties likely to arise if these cases are not dismissed. Five cases involve Colombian Plaintiffs. Defendant Ford expresses great concern that the burden of coordinating and arranging discovery and deciding motions in these cases "would threaten to grind the entire pretrial process to a halt, harming Colombian and American parties alike." Ford Memo (Colombian Cases) at 20. While we acknowledge that coordinating the multidistrict litigation in the Firestone cases is no small task for the Court, we are not so overwhelmed that five cases out of the now pending 700 [34] would

**32.** We offer no comment on the merits of the arguments Ford makes in support of its Motion to Strike Plaintiffs' Requests for Punitive Damages or, in the Alternative, for Partial Summary Judgment. We note only that on the basis of those arguments, Defendants concede, for purposes of the forum non conveniens motions, that Colombian law does not govern the issue of punitive damages. Joint Reply at 35 n. 16.

**33.** It does not affect the first prong of Defendants' argument—that Florida is not "at home with law that must govern the action"—although we are confident that Florida courts are not unfamiliar with the law of Michigan, especially as compared to their level of familiarity with the law of Colombia.

**34.** Of course, Defendants characterize the burden as much greater than the five cases before us. According to Ford and Firestone, by retaining jurisdiction over the Rodriguez and Escobar/Iragorri cases, we are inviting the filing of multitudes of foreign-accident cases by foreign nationals. Joint Reply at 30. We take seriously Defendants' concern. In *Piper*, the Supreme Court cautioned that, if a

certain forum non conveniens standard were adopted, then:

> [t]he American courts, which are already extremely attractive to foreign plaintiffs, would become even more attractive. The flow of litigation into the United States would increase and further congest already crowded courts.

*Piper*, 454 U.S. at 252, 102 S.Ct. 252. Unlike in *Piper*, however, our disposition of this motion does not involve a rule potentially applicable to every forum non conveniens disposition. In *Piper*, the Supreme Court rejected the lower court's reasoning that it "could not dismiss the case on grounds of forum non conveniens *where dismissal might lead to an unfavorable change in law*." 454 U.S. at 252, 102 S.Ct. 252 (emphasis added). Here, we evaluate the motion to dismiss by considering the application of established factors to the facts of the cases at hand. Defendants' concerns of a drastic increase in the number of foreign cases filed as a result of our ruling should be lessened in light of the fact that in evaluating any forum non conveniens motion, including this one, "each case turns on its facts." *Van Cauwenberghe*, 486 U.S. at 529, 108 S.Ct. 1945 (quotation omitted).

constitute the proverbial straw. *See, e.g. Peregrine*, 89 F.3d at 47 (courts have much discretion in determining whether they can accommodate additional cases); *McLellan*, 26 F.Supp.2d 947 (acknowledging its very large docket but exercising its discretion to decide that case would not interfere with court's other business).

The burden of trial, as opposed to pretrial proceedings, does not fall on our court, making us slightly less comfortable with determining that these cases can be accommodated. As Defendants point out, the Southern District of Florida is a busy court. Joint Reply at 31 (citing 2000 State of the Court, Southern District of Florida, at 7). However, because of the demands made upon it due in part to "its geographic locations as a gateway to the Caribbean and South America," the Southern District of Florida "has been a historical leader in case processing innovations." 2000 State of the Court, Southern District of Florida, at 7. Indeed, the Southern District of Florida seems uniquely positioned among United States courts to meet the challenges presented by these cases. *See id.* (court staff includes "linguists, who provide interpreter services in a wide variety of languages").[35] Moreover, as noted earlier, there is local interest in the cases which justifies the commitment of judicial resources to their resolution. *See Piper*, 454 U.S. at 261, 102 S.Ct. 252.

On the whole, the balance of public factors does not compel the dismissal of these cases on the ground of forum non conveniens. While we cannot ignore Colombia's interest in the safety of its citizens, neither can we ignore the U.S. interest in these cases as evidenced by Congressional testimony about the notice Ford and Firestone received on the alleged defects through the accidents in South America. *See In re Air Crash Off Long Island New York, on July 17, 1996*, 65 F.Supp.2d 207, 217 (S.D.N.Y. 1999) (congressional hearings and investigations by administrative agencies suggest sufficient public interest to justify imposition of jury duty). The need "to delve into the tenets of an unfamiliar legal system" for the issues of liability and compensatory damages is "justifiably [a] concern[ ]" to district courts. *Kamel*, 108 F.3d at 805. However, "we must guard against an excessive reluctance to undertake the task of deciding foreign law, a chore federal courts must often perform." *Manu International, S.A. v. Avon Products, Inc.*, 641 F.2d 62, 68. We have no doubt that our court and the Southern District of Florida are up to the task of applying the law of Colombia, if necessary. *Lehman v. Humphrey Cayman, Ltd.*, 713 F.2d 339, 345 (8th Cir.1983) ("[f]ederal courts are quite capable of applying foreign law when required to do so . . . ."). While this factor is part of our consideration of the motion, ultimately it cannot carry the weight Defendants assign to it. Finally, the burden on the courts and juries if these cases are retained does not weigh strongly in favor of dismissing the cases.

In combination, the public interest factors suggest that Colombia might be a slightly more convenient forum, but these factors do not meet the burden of "pointing towards" trial in the alternative forum. The public interest factors simply do not outweigh the private interests of the parties in retaining jurisdiction in the United States.

**Private Interest Factors—Venezuela**

 While our finding that Venezuela is not an available forum for these cases compels us to deny Defendants' motion to dismiss, we nonetheless shall also examine the private and public interest factors af-

---

35. Of course, nothing in this statement prevents Defendants from seeking a transfer under 28 U.S.C. § 1404 from the Southern District of Florida, once the case has been remanded to the transferor court.

fecting convenience. With regard to the private interest factors relevant to the forum non conveniens inquiry, the situation for the Venezuelan cases is very similar to that of the Colombian cases. In the interest of avoiding unnecessary repetition, in this section, we will note briefly which factors we deem to be the same and explain the weight we accord to any differences between the two sets of cases.

As with Colombian courts, it appears that certain types of evidence gathered in the MDL proceedings might not be admissible in Venezuelan courts. On behalf of Plaintiffs, Anibal Jose Rueda, former Justice of the Supreme Court of Justice in Venezuela and current university professor, opines that "witness testimony obtained abroad shall have no value whatsoever if it was not taken under order issued by the Venezuelan judge hearing the case." Rueda Stm. ¶ 5. Depositions would require ratification, a procedure similar to that required in Colombia. *Id.* ¶ 6. Cottín, Defendants' expert, responds that under Article 38 of the Venezuelan Statute of Private International Law, the depositions produced in these pretrial proceedings could be accepted as "simple" evidence. Cottín Reply at ¶¶ 21–22. We find Rueda to be the more reliable expert. Rueda's opinion is based on his experience as a judge in various Venezuelan courts and on Articles 813–818 of the Code of Civil Procedure. *Id.* ¶ 4. In addition, Rueda provides a more detailed explanation of his reasoning, explaining the differences be-

tween "customary" and "non-customary" evidence and addressing the Statute of Private International Law cited by Cottín. Rueda Stm. ¶¶ 3–5, 9. Finally, as explained in the section of this opinion on the availability of the Venezuelan forum, we have serious doubts concerning Cottín's expertise. As such, as we decided with regard to the Colombian cases, Defendants' offer to make discovery[36] available to foreign Plaintiffs does not establish that there will be meaningful ease of access to evidence collected in the consolidated proceeding before us.

As in the Colombian cases, we must look at the relative importance and availability of various types of evidence, keeping in mind that liability will be a major source of contention at trial. While there are some differences between the Colombian and Venezuelan sets of cases, Plaintiffs again make a convincing argument that liability evidence reposes in the United States. In addition, as a whole, ease of access to proof weighs in favor of retaining jurisdiction in the United States.

Unlike in the Colombian cases, most of the vehicles at issue in the Venezuelan cases were manufactured in Venezuela, rather than in the United States.[37] However, it remains the case that most of the documents and witnesses related to the design and testing of the vehicles are in this country. As Ford stipulates, the Ford Explorers distributed in Venezuela were "substantially designed" in the United

---

**36.** The experts do agree that the vast number of documents (as opposed to depositions and expert reports) produced in the MDL could be presented in a Venezuelan proceeding, just as we found that they could be used in a Colombian trial. Rengel Dec. ¶ 9; *see* Rueda Stm. ¶ 11.

**37.** According to Defendants' summary, about one quarter of the subject tires for the Venezuelan cases were American-made. Summary of Venezuelan and Colombian Accident

Cases, attached as Supp.App. A (citing case-specific discovery in individual cases). For these cases, witnesses and documents for the design defect are in the United States. The remainder of the tires either were produced in Venezuela or their place of manufacture cannot be determined. *Id.* As we explained in the discussion of the Colombian cases, a great deal of the evidence on the alleged design defects for the Venezuelan-made tires is available in the United States because so much of the design took place here.

States. Ford Stips. ¶ 1. In addition, "most original design and engineering documents" for these Explorers are located in the United States, and "[v]irtually all of documents regarding the J–Turn and ADAMS testing of the stability of the Ford Explorer vehicles are located in the United States," as are the persons most knowledgeable about this testing. *Id.* ¶¶ 2–5. Information on the accident rates for these vehicles is also available primarily in the United States. Most of the Ford personnel serving on the Critical Concerns Review Group, which began investigating tread separation in Venezuela in August through October of 1999, are employees of Ford North America. *Id.* ¶¶ 11,18–22. Even much of the information concerning vehicle manufacture is available here. While assembly of the vehicles took place in Venezuela, most of the component parts are contained in "knockdown kits" composed of U.S. parts and distributed to Venezuela through the Ford U.S. distribution center in Jacksonville, Florida. *Id.* ¶ 24; Baughman Dep. at 52–53. Component parts from Venezuelan sources must be substantially similar to those used in U.S. vehicles. Baughman Dep. at 38–39. As noted before, while the documents could be transported to Venezuela without much inconvenience, crucial expert reports and deposition testimony probably could not be made available in Venezuelan courts, demonstrating that design defect liability evidence is more accessible in the United States.[38]

For one group of cases, however, there is an important difference from the Colombian cases with regard to the location of liability evidence. For these fifteen disputes,[39] Ford and Firestone make specific allegations that improper service conditions played a role in the accidents. Esworthy states that his inspections of the tires found improper service conditions, such as repair of injury larger than repairable size and repairs outside repairable area. Esworthy Aff. ¶ 9. For these cases, records and testimony concerning vehicle and tires service history are likely to be important. It also appears that most of the maintenance performed on these tires was not done by Ford dealerships, indicating that access to maintenance documents and witnesses may be difficult for Defendants. *See e.g.*, Plaintiff Jaimes' Resps. to First Set of Prod. Reqs. of Defs. Ford and Firestone at 5 (maintenance service provided by Distribuidora de Cauchos La Fria C.A.). However, for all of these cases, another important source of information on liability is in the United States: the tires involved in the accidents. Martinez Dec. ¶¶ 4, 6; Fernandez Dec. ¶¶ 7, 9–10; Huggins Dec. ¶ 2–4. For all but one case,[40] the vehicles are also in the United States.

---

38. As explained in our discussion of the Colombian cases, this conclusion holds especially strongly for those Venezuelan cases in which the vehicle at issue was American made. These cases are IP 01–5189 (Luis Alfonso Perozo), IP 01–5190 (Luis Alfonso Perozo), IP 01–5191 (Maria Zarrameda de Perozo), and IP 01–5222 (Lopez).

39. These cases with the names of Plaintiffs are: IP 01–5349 (Jaimes), IP 01–5314 (de Altuve), IP 01–5178 (Sarache), IP 01–5181 (Armao), IP 01–5182 (Ibarra), IP 00–5113 (Dias), IP 00–5078 (Castrillo/Viloria/Garcia), IP 00–5079 (Viloria), IP 01–5395 (Maldonado), IP 01–5223 (de Ramirez), IP 01–5224 (Salas de Sanchez), IP 01–5225 (Flores), IP 00–5109 (Sayas), IP 01–5219 (La Cruz), IP 01–5220 (Beltran). The Sarache, Armao and Ibarra cases are related to each other. The Castrillo/Viloria/Garcia and Viloria cases arose out of the same accident. The de Ramirez, Salas de Sanchez, and Flores cases are related to each other. One accident gave rise to the La Cruz and Beltran cases.

40. In the Sayas case, IP 00–5109, the vehicle was disposed of by Plaintiffs' insurance company. Resps. of Sayas to Forum Non Conveniens Prod. Reqs. of Defs. Ford and Firestone at ¶ 2.

Martinez Dec. ¶ 6; Fernandez Dec. ¶ 7; Huggins Dec. ¶ 2–4. As such, even for these cases, it appears that the bulk of relevant liability evidence is more accessible in the United States.

As in the Colombian cases, evidence on compensatory damages and "moral damages"[41] will be important to these disputes. As in the Colombian cases, Plaintiffs already have produced many medical records. *See, e.g.,* Supp.App. B., Box 89, Document #14264 (medical record in Jaimes case, IP 01–5349). Of course, there are more medical and employment records to be produced, and most of this information is in Venezuela. *See* Entry for March 8, 2002, ¶ 1 (ordering Venezuelan Plaintiffs to execute authorization to obtain medical records for ten years prior to date of accident to present or to time of trial).[42] However, as we concluded for the Colombian cases, we do not find that the importance of this evidence outweighs that of the evidence relating to liability, most of which is in the United States.

The analysis concerning considerations of compulsory process and cost of transporting witnesses is much the same for the Venezuelan cases as for the Colombian cases. A significant difference also inuring to a retention of jurisdiction in the United States is that for many of the Venezuelan cases, third party witnesses have indicated their willingness to testify, which would reduce the hassle of letters rogatory in some situations. Pls.' Ex. 14. For instance, an affidavit, randomly selected from the large stack of affidavits comprising Plaintiffs' Exhibit 14, commits Wilfredo Jose Lugo Chavez to provide testimony in the cases for which he was an eyewitness to the traffic accident.[43] Chavez Aff. ¶¶ 1–2. An example of a medical care provider who is willing to testify is Freddy Jesus Campos A. Campos Aff. ¶¶ 1–2. He rendered medical treatment to Eduardo Antonio Urdaneta Salegui, Plaintiff in IP 00–5011. The more ready availability of non-party witnesses[44] strengthens the case against De-

**41.** Venezuelan courts recognize moral damages, permitting recovery for pain, suffering, mental anguish, shame and other "moral" injuries. Rengel Dec. ¶ 15.

**42.** In Supplemental Appendices O and P, Defendants present evidence they claim "underscore[s] the complexity and inconvenience of trying these foreign accident cases in the United States." Defs.' Resp. to Pls.' Mot. to Strike Apps. O and P of Defs.' Supp. Apps. in Supp. of Reply Submissions Re Mots. to Dis. Venezuelan and Colombian Cases on the Grounds of Forum Non Conveniens at 3. Plaintiffs filed a *Motion to Strike* these appendices on the grounds that they are not the *factual* materials contemplated by Magistrate Judge Shields' order granting leave to file supplemental briefing. Pls.' Mot. to Strike ¶ 1. We *DENY* Plaintiffs' motion as moot. Having considered these appendices, we find that they are not as probative as Defendants hope or as Plaintiffs fear. For instance, Defendants claim that Appendix O shows that "*[s]everal* of plaintiff's counsel have refused to produce Venezuelan witnesses for deposition in the United States." Defs.' Resp. to Mot. to

Strike at 3 (emphasis added). A review of the appendix shows that it includes letters from only two (not "several") Plaintiffs' attorneys and that, rather than refusals to produce witnesses, on their faces, the letters refer to scheduling problems and suggest that counsel coordinate their calendars and those of the proposed deponents. Furthermore, the impasse regarding the scheduling of these depositions appears to have been resolved by the parties. *See* Entry for March 18, 2002, ¶ 1.

**43.** The Plaintiffs in these cases are Milagros Albers (IP 00–5081), Alfredo Matos Albers, (IP 00–5100), and Milagros Albers and Peter K. Albers (IP 00–5095).

**44.** Defendants attempt to minimize the significance of the affidavits from non-party witnesses by nitpicking the language used. Joint Reply at 23. Many of the affiants express willingness to testify "upon reasonable notice." *See, e.g.,* de Montenegro Aff. ¶ 2–4 (eyewitness to accident in cases of Andres Miguel Octavio (IP 00–5112) and Teresa Lopez Casadiego (IP 00–5103)). The court does not

fendants' motion as compared to the already solid case made for the Colombian disputes.[45]

A few of the factors can be dealt with in short order. The analysis concerning view of the accident scene is exactly the same for the Venezuelan cases as it is for the Colombian cases. Likewise, no new elements must be considered on the question of enforceability of judgment or on the issue of the expense and inconvenience of translation.[46] In contrast to the Colombian cases, the threat of physical violence is not a factor in the analysis of the Venezuelan cases.

Among the "other practical problems that make trial of a case easy, expeditious and inexpensive" that we must consider anew with regard to the Venezuelan cases is the difficulty Defendants may face in impleading third-party defendants in various cases. In the Colombian cases, Defendants suggest as possible third-party defendants the allegedly negligent drivers of the vehicles, the service stations who allegedly performed maintenance on the tires and vehicles, the dealerships, individuals, and retail tire establishments who sold the tires and vehicles, and Bridgestone/Firestone Venezolana who manufactured the tries at issue in some of the Colombian cases. All of these entities are implicated in at least some of the Venezuelan cases. Ford Motor de Venezuela, who manufactured some of the vehicles at issue in the cases is also listed as a potential third-party defendant. In addition, Defendants suggest as a potential third-party defendant one other individual in IP 00–5112 (Octavio). In this case, Defendants deposed Veronica Mercano de Montenegro who described removing Veronica Octavio, an injured child on whose behalf damages are sought, from the left traffic lane of the autopista where the accident occurred without using a backboard. De Montenegro Dep. at 59–60, attached as Supp.App. Q. Ford and Firestone claim that this account

agree with Defendants' contention that this qualification ("upon reasonable notice") of their willingness to testify renders their commitments null. Nor do we find that affiants who stated that they have "no problem" giving their testimony in the United States were hedging sufficiently to render their affidavits ineffective for the purposes offered. *See, e.g.,* Blanco Aff. ¶ 3 (affirming that he has "no problem whatsoever" in giving testimony in the United States about the medical assistance he rendered to Salegui). While we admit that this choice of phrase is a bit odd, we believe that Defendants' reading of the phrase attributes to it a meaning to which it is not readily susceptible.

45. In addition, for some of the Venezuelan cases, certain witnesses are subject to compulsory process. For example, the Albers case (IP 00–5081) was filed in the Southern District of Florida. Dr. Henry Pedrique, a witness in that case, is a resident of Florida, and is subject to process there. Plf.'s Answers to Forum Non Conveniens Interrogs. of Defs.' Firestone and Ford ¶ 10; Defendants' Summary, Supp.App. A.

46. The parties stipulate that in the following cases, the primary language of Plaintiffs and of the vehicle occupants is not Spanish: IP 00–5011 (Salegui), IP 00–5081 (Albers), IP 00–5100 (Albers), IP 00–5112 (Octavio), IP 00–5115 (David), IP 00–5119 (David), IP 00–5120 (David), and IP 00–5222 (Lopez). Unfortunately, the stipulation does not say what the primary languages of these persons are, and a review of the record has not revealed an answer to this question. In one of these cases, IP 00–5112 (Octavio), one of the Plaintiffs is an Italian citizen, so we are not inclined to assume that the parties meant English when they stipulated that the primary language was "not Spanish." If the language spoken is English, then translation would not be necessary for trial in the United States, but would be needed for trial in Venezuela. If the language is something other than English or Spanish, translation would be necessary in either forum, rendering neither forum more convenient than the other. Hence, we find that what little significance we accord this factor weighs in favor of retaining jurisdiction in the United States.

establishes a basis for a third-party action against those responsible for any additional injuries Veronica may have suffered due to manipulation from the scene without a backboard.[47] Supp. Apps. Summary at 2. As in the Colombian cases, this factor favors dismissal.

We must also consider another argument unique to the situation of the Venezuelan cases. Plaintiffs argue that the convenience of trying these cases in Venezuelan courts would be compromised by the long delays plaguing the Venezuelan judicial system. Plaintiffs' Memo. at 35–36. According to Rueda, Plaintiffs' expert, in August 1999, a judicial emergency was declared and, by November 1999, "more than two hundred judges had been removed form their positions, supposedly for corrupt practices." Rueda Stm. ¶ 14. This action could only exacerbate the backlog of cases in the lower courts, which the World Bank estimated in 1997 had 2 to 3 million cases pending. World Bank Project Appraisal, Report No. 17212–VE, Dec. 9, 1997 at 9. On May 31, 2001, Omar Mora, acting president of the Venezuelan Supreme Court declared "that we have still not been able to solve the judicial crisis" following the 1999 purging of the judicial system. *Senior Judge Criticizes Courts in Venezuela,* N.Y. Times, May 31, 2001. Defendants argue that the situation is improving. Cottín claims that new judges have been appointed and that construction projects are underway to ameliorate inadequate facilities throughout the Venezuelan judicial system, Cottín Reply ¶¶ 29, 31, although improvement appears erratic, as Rueda notes that on June 18, 2001, the Caracas courts reduced the number of business days per week in order to relieve some of the overcrowding and repair problems. Rueda Stm. ¶ 15.

While we find Rueda's characterization of the situation more persuasive, we accord this factor only slight weight in favor of retaining jurisdiction. The best argument based on delay against forum non conveniens dismissal cites exact evidence for the length of the delay and a delay of many years. *See Bhatnagar,* 52 F.3d at 1227–29 (credible expert testimony that delay could extend 25 years). This standard (or abyss) has not been reached here. On the other hand, delay in the foreign court usually is considered to the extent that it may render the alternative forum inadequate. *See, e.g. Broadcasting Rights Int'l Corp. v. Societe du Tour de France, S.A.R.L.,* 708 F.Supp. 83, 86 (S.D.N.Y.1989). Here, we note only that it suggests Venezuelan courts are less convenient for these trials, and accord it appropriate weight on that basis. *See Brazilian Investment Advisory Services, Ltda. v. United Merchants & Mfg., Inc.,* 667 F.Supp. 136, 138 (S.D.N.Y. 1987) (considering delay as one balancing factor).

The balancing of the private interest factors differs slightly from the balancing in the Colombian cases. Special attention must be paid to the fifteen cases for which Ford and Firestone have provided evidence to support their general allegation that the tires and vehicles at issue were improperly serviced and to the one case in which improper emergency medical care may have been provided. This evidence provides a weightier basis for dismissing the cases because Defendants would be unable to implead potentially responsible third parties if the cases remained in U.S. courts.[48] *See Lacey II,* 932 F.2d at 182.

---

**47.** We express skepticism of this claim because Defendants have not presented any expert testimony that Colombia recognizes liability for additional injuries caused by emergency medical technicians (or by Good Samaritans, since we are unsure of whether Ms. de Montenegro is a medic).

**48.** As in Colombia, under Venezuelan law, tortfeasors are jointly and severally liable, suggesting that Plaintiffs, barring contributo-

However, this factor does not ultimately tip the balance in favor of Defendants' position. For these cases, as for all the Venezuelan cases, evidence is more readily available here due to the inability to use much of the MDL discovery in Venezuelan proceedings. For the fifteen cases with allegations of faulty maintenance in particular, this factor is especially weighty given that crucial liability evidence, in the form of the tires and vehicles themselves, is in the United States.[49] Furthermore, while the inconvenience that could result from lengthy delays in Venezuelan courts due to the problems highlighted in Rueda's testimony does not concern us as much as the threat of physical violence facing parties and witnesses (and court officials) in the Colombian cases, this factor still counsels in favor of retaining jurisdiction.

In sum, we find that these private interest factors outweigh the Defendants' difficulties in impleading third-party defendants in United States proceedings. *Nowak v. Tak How Investments, Ltd.,* 94 F.3d 708, 720 (1st Cir.1996) (giving more weight to factors affecting plaintiffs' convenience than to inability to join third-party defendants); *see also Massaquoi,* 945 F.Supp. at 63 ("While the inability to implead a third party is a factor that weighs in defendant's favor, it is not conclusive and courts have refused to dismiss actions on such grounds."). The private interests factors in the Venezuelan cases favor denying Defendants' motion to dismiss.

### Public Interest Factors—Venezuela

■ Few modifications of the analysis of public interest factors for the Colombian cases are needed to address these factors for the Venezuelan Plaintiffs. With regard to the respective local interests in these cases, the only wrinkle is that Venezuela is willing to cede some of its interest in these cases in favor of trial in the United States. Included in Plaintiffs' submissions is an affidavit from Colonel Jose Rafael Quero Vallecillos, National Director of the Department of Technical Transportation Surveillance (Cuerpo Tecnico de Vigilancia del Transito Terrestre) which is part of the Ministry of Infrastructure of the Bolivarian Republic of Venezuela. Pls.' Ex. 14. He testifies that his department "has an special [sic] interest in the investigation and elucidation of [the] accidents by the United States Courts." Vallecillos Aff. ¶ 4.[50] Because Venezuelan interest in litigating these cases in Venezuela is not strong, unlike in the Colombian cases, this factor does not weigh in favor of Defendants' position on forum non conveniens.

For the vast majority of the cases, the analysis concerning the need to apply for-

---

ry negligence and assuming attribution of fault to Firestone or Ford, could recover from either Firestone or Ford the entire amount awarded, regardless of whether third parties are part of the proceedings. Cottín Dec. ¶¶ 18–19 (citing Venezuelan Civil Code Arts. 1.189 and 1.195). Defendants have presented no expert testimony that Venezuelan law provides for a right of contribution, weakening Ford and Firestone's argument that they would be prejudiced by the inability to implead third-party defendants. Moreover, even if they can seek contribution, they can do so in a separate action.

49. These cases in which Defendants provide evidence of improper tire maintenance are not the only cases for which Plaintiffs have made the tires and vehicles available in the United States. Martinez Dec. ¶ 6 (for 39 cases, subject vehicle has been imported to Miami); Fernandez Dec. ¶ 7 (listing 23 cases for which subject vehicles have been imported to Miami).

50. Colonel Vallecillos also states that the Department is willing to place the officers who investigated certain accidents in Venezuela "at the disposal of the appropriate United States individuals in order to provide testimony through deposition and/or at trial regarding the events of the accidents" and will authorize and order their deployment for this purpose. Vallecillos Aff. ¶¶ 4–5.

eign law is exactly the same. Of the 116 cases with Venezuelan Plaintiffs, 111 cases were filed in the Southern District of Florida, so the analysis is the same as for the Colombian cases also filed in that district. Three cases were filed in the Southern District of Mississippi[51] and were included in Ford's motion to strike the punitive damages claims discussed in the section on Colombian cases. For these cases also, the analysis concerning choice of law is no different. One case, IP 01–5340(Kim) was filed in the Central District of California, and another case, IP 01–5434 (Castillo de Zerpa), was filed in the Middle District of Alabama. Both California and Alabama have choice of law rules that differ from the Florida and Mississippi choice of law rules that formed the basis of Ford's argument that Michigan law applies to the question of punitive damages in these cases. As such, for purposes of the forum non conveniens inquiry, we assume without deciding that Venezuelan law applies to all issues in these two cases. Hence for the Kim and Castillo de Zerpa cases, there is a stronger argument than that applicable to the Colombian cases for dismissal on forum non conveniens grounds.

With regard to the administrative difficulties likely to arise if these cases are not dismissed, certain unique factors must be considered for the Venezuelan cases. Most obviously, there are many more Venezuelan cases than there are Colombian cases. Our assessment of the work involved in pretrial proceedings and the fact that there is local interest in these cases leads us to the conclusion that these cases can nonetheless be accommodated in the MDL. The parties have not told us whether the courts in California, Mississippi, and Alabama have crowded dockets or whether they are prepared to meet the challenges

presented by the international nature of these cases. Because none of these courts would be required to try more than three cases, and because Defendants bear the burden of demonstrating forum non conveniens, we conclude that this factor does not point to dismissal for the five cases not filed in the Southern District of Florida. As to the 111 cases from the Southern District of Florida, we agree with Defendants' assertion that this number of trials would be a burden to the court and a factor favoring dismissal.

In combination, the public interest factors for the five cases filed in California, Mississippi, and Alabama favor denying Defendants' motion. The burden on the courts is far from overwhelming and, as in the Colombian cases, we guard against an excessive reluctance to undertake the application of foreign law. Furthermore, Venezuelan's willingness to cede its interest in trying the cases to American courts tilts the balance toward retaining jurisdiction. For the 111 cases from the Southern District of Florida, the public interest factors suggest dismissal. However, even for these cases, we find that the public interest factors simply do not outweigh the private interests of the parties in retaining jurisdiction in the United States.

### Venezuelan Cases—Special Consideration to German Plaintiffs

In our assessment of forum non conveniens, we must give special attention to three cases presenting a wrinkle in the relatively straightforward analysis of forum non conveniens for cases involving Venezuelan Plaintiffs injured in accidents that occurred in Venezuela. Plaintiffs in IP 01–5325 (Haenske), IP 01–5326 (Hempel), and IP 01–5327 (Blochwitz) are German citizens and residents who were al-

---

**51.** These cases are IP 01–5333 (Lezama), IP 01–5334 (Canelon), and IP 01–5335 (Rome- ro).

legedly injured in accidents occurring in Venezuela.[52] Not surprisingly, many of their healthcare providers reside in Germany and are not subject to compulsory process in either of the proposed forums. Likewise, occurrence witnesses, to the extent they are not Plaintiffs in the cases, are not subject to compulsory process in either Venezuela or the United States. In addition, many of the medical and employment records of these Plaintiffs originate from Germany and would need to be transported and translated for trial in either proposed forum. Evidence concerning defect is in both the United States and Venezuela because the vehicle and tires were American-designed and Venezuelan-assembled. As such, it is clear that while the United States may not be a particularly convenient forum for hearing these cases, the balancing of these factors certainly does not "point towards" trial in Venezuela. Another reason to retain jurisdiction over these cases is that they arise from the same accident at issue in IP 01–5343 (Ordaz), IP 01–5344 (Diaz), and IP 01–5347 (Engel). Trying the cases in the same forum likely will be more efficient and will lessen the risk of inconsistent results. For these reasons, we find that the balancing of factors favors retaining jurisdiction over these cases also.

### Conclusion

For the reasons set forth above, we *DENY* Defendants' motion to dismiss on the ground of forum non conveniens the cases arising from accidents that occurred in Venezuela and Colombia, as listed in the caption of this entry. We also *DENY* Plaintiffs' Motion to Strike Appendix O and Appendix P of Defendants Ford and Firestone's Supplemental Appendices in Support of Reply Submissions Re Motions to Dismiss Venezuelan and Colombian Cases on the Grounds of Forum Non Conveniens.

---

**52.** We note that despite the fact-sensitive nature of the forum non conveniens inquiry, the parties did not present any argument dealing with the unique circumstances of these cases.